UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                Case No. 21-cr-139

DAVID GARNER,

        Defendant.

## PLEA AGREEMENT

1. The United States of America, by its attorneys, Richard G. Frohling, United States Attorney for the Eastern District of Wisconsin, and Philip Kovoor & Kevin Knight, Assistant United States Attorneys, and the defendant, David Garner, individually and by attorney Christopher Cherella, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2. The defendant has been charged in four counts of a five-count indictment, which alleges violations of Title 18, United States Code, Sections 2(a), 371, 844(i), and 844(n).

3. The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to plead guilty to the following count set forth in full as follows:

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

Beginning on or about August 24, 2020, and continuing until on or about August 25, 2020, in the State and Eastern District of Wisconsin and elsewhere,

**ALLEN KING and
DAVID GARNER**

knowingly and willfully conspired with each other and others, known and unknown to the Grand Jury, to maliciously damage, and attempt to damage, by means of fire, a building located at 3805 22nd Avenue, Kenosha, Wisconsin, which was used in interstate commerce and in an activity affecting interstate commerce.

In violation of Title 18, United States Code, Sections 844(i), 844(n), and 2(a).

5. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

6. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries a mandatory minimum term of imprisonment of five years; a maximum term of imprisonment of twenty years; a fine of up to $250,000; a mandatory $100 special assessment; and a maximum term of three years' supervised release. The parties further recognize that a restitution order may be entered by the court.

2

7.  The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF REMAINING COUNTS

8.  The government agrees to move to dismiss the remaining counts of the indictment, as they pertain to the defendant, at the time of sentencing.

## ELEMENTS

9.  The parties understand and agree that in order to sustain the charge of conspiring to commit arson, as set forth in Count Two of the Indictment, the government must prove each of the following propositions beyond a reasonable doubt:

> First, the conspiracy as charged in Count Two existed; and,
> Second, the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy.

## SENTENCING PROVISIONS

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

3

13. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

14. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

## Base Offense Level

16. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count Two of the indictment is 24 under Sentencing Guidelines Manual Sections 2X1.1 and 2K1.4(a)(4).

4

## Acceptance of Responsibility

17. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

18. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

19. Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

20. The government agrees to recommend a sentence at the low-end of the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

21. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth above. The parties further understand that the sentencing court will be guided

by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

22. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

23. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

24. The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form. The defendant further agrees, upon request of FLU whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest, cooperate in the liquidation of any such assets, and participate in an asset deposition.

### Special Assessment

25. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

26. The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from: (a) the applicable sentencing guideline range; (b) any applicable statutory mandatory minimum; or (c) both. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

27. In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

   a. If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

   b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

   c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

7

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.
e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

28. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

29. The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

30. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

8

31. The defendant knowingly and voluntarily waives any claim or objection he may have based on statute of limitations and venue.

### Further Civil or Administrative Action

32. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

### GENERAL MATTERS

33. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

34. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

35. The parties acknowledge, understand, and agree that the United States Attorney's Office is free to notify any local, state, or federal agency of the defendant's conviction.

36. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

37. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

38. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 8-16-22

DAVID GARNER
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 8/16/22

CHRISTOPHER CHERELLA
Attorney for Defendant

For the United States of America:

Date: 8/18/2022

for RICHARD G. FROHLING
United States Attorney

Date: 8/19/22

PHILIP KOVOOR
KEVIN KNIGHT
Assistant United States Attorneys

11

## Attachment A

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. These facts are based upon information provided by confidential informants, the anticipated testimony of citizen witnesses and law enforcement agents, electronic surveillance, records obtained via grand jury subpoenas, and physical evidence seized throughout the investigation. The information is provided for the purpose of setting forth a factual basis for the defendant's guilty plea. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

### Overview

On August 23, 2020, Jacob Blake was shot multiple times by officers of the Kenosha Police Department. That incident triggered both non-violent protests and violent rioting, including numerous arsons throughout the City of Kenosha. The ATF subsequently deployed its National Response Team of arson investigators to Kenosha to process the fire scenes, collect video evidence, and identify potential suspects.

### *Charlie's Bar*

On August 26, 2020, ATF and the Kenosha Police Department initiated a fire scene investigation at Charlie's 10th Hole bar, located at 3805 22nd Avenue, Kenosha, Wisconsin—a building and unit of real property used in an activity affecting interstate commerce and a place of public use. Investigators located two areas of separate fire damage, one on the outside of the building and one on the inside. A subsequent Origin and Cause investigation by the ATF determined both fires were "incendiary" in nature.

As part of their investigation, law enforcement collected hours of surveillance videos from multiple locations, including Charlie's 10th Hole bar itself. The following facts are distilled from that same video footage.

On August 24, 2020, at approximately 11:25 pm, multiple people walked southbound on a sidewalk toward Charlie's 10th Hole bar. At approximately 11:26 pm, David GARNER used an apparent ignitable liquid to set fire to the north exterior of the bar.

At approximately 11:27 pm, this same group of people reacted to an unknown off-camera event by crouching and looking to the southwest. In response to that same event, Kevin MARTINEZ removed a handgun from his waistband and fired at least two rounds toward the southwest.

Investigators later recovered spent 9mm ammunition casings on the ground near the area where the shooting had occurred. Law enforcement was able to determine that none of the casings were manufactured in the state of Wisconsin. MARTINEZ is a felon, having been convicted of "Aiding An Offender-Accomplice After the Fact" in Hennepin County, Minnesota, Case No. 27-cr-18-22952.

12

At approximately 11:28:22 pm, a surveillance camera captured images of Allen KING standing next to the male believed to be GARNER. KING is holding an object while GARNER pours liquid onto the same object.

At 11:28:51 pm, surveillance cameras captured an illumination near the front window at the bar. At about this time, KING appeared by the front window. KING was the only subject near the front window at this time. At approximately 11:28:57 pm, interior cameras at the bar captured images of a flaming object flying through the air from the direction of the front window and landing behind the bar. KING, along with others in his group, subsequently fled westbound across 22nd Avenue toward a CVS located at 3726 22nd Avenue.

### *CVS*

Approximately 14 people unlawfully entered the previously mentioned CVS store at approximately 11:30 pm on August 24, 2020. The unlawful intruders included KING, MARTINEZ, GARNER, Anthony CLAY, and Antoine EUBANKS, a.k.a. "Poloc."

The Kenosha Police Department responded to the CVS burglary and apprehended a man ("JM") inside the store while other intruders fled. Upon arrival, officers observed the bottom half of CVS's glass sliding doors were shattered and entered the building to check for subjects. Officers located a silver hammer with a black handle and a flathead screwdriver with a black-and-red handle in the immediate area around JM. Officers noted that cash drawers and pill bottles were strewn across the floor, and the store was in disarray. The pharmacy section of the CVS had hundreds of pill bottles strewn across the floor, one shelf of medication was tipped over, and the medication refrigerators were opened. CVS pharmacy completed an inventory and found that $1,247.53 of controlled substances and $10,821.42 of non-controlled substances were missing from the store. JM was charged with burglary, in violation of Wisconsin Statute 943.10(1m)(a), the next day in Kenosha County. JM eventually acknowledged that he had traveled with a group of people from the Twin Cities in Minnesota on August 24, 2020, to participate in "the riots" in Kenosha, Wisconsin. He said that he was standing next to the person who started the fire at Charlie's 10th Hole bar. JM also said there were three vehicles that traveled together from Minnesota to Kenosha: a Dodge car, a white car, and a dark SUV. JM said he was a passenger in the Dodge car.

Additional surveillance video confirms that a Dodge car, white sedan, and dark SUV parked in the area behind the Stella Hotel in Kenosha on August 24, 2020 at approximately 9:30 pm—consistent with JM's statement. CLAY, KING, EUBANKS and MARTINEZ can be seen exiting the vehicles.

### *Citgo*

The Citgo gas station located at 2710 Roosevelt Road, Kenosha, Wisconsin was also burglarized during the early morning hours of August 25, 2020. The following is a summary of images captured by the Citgo surveillance cameras that evening.

During the early morning hours of August 25, 2020, the glass of the Citgo's front windows and door were broken. Multiple people entered the gas station and began to loot.

13

Shortly thereafter, a dark SUV approached the gas station and KING exited the vehicle with EUBANKS. KING eventually entered the store, possessing what appears to be a handgun.

At one point KING took a shooting stance with both hands on the suspected handgun and aimed it at the office/cashier booth door. Shortly thereafter most of the other people inside the store suddenly flinched and quickly exited the store. The unidentified people subsequently re-entered the store.

After he placed the handgun in his front pocket, KING then attempted to open the sliding windows to the cashier booth. At about this same time, EUBANKS enters the gas station. EUBANKS and KING subsequently began working together to force open the cashier window. EUBANKS dislodged one of the cashier booth windows, and KING jumped through the window into the cashier booth.

Once inside the cashier booth, KING emptied a garbage can and began placing packs of cigarettes into the can. By approximately 12:23:05 am, KING had exited the cashier booth with a metal garbage can containing cigarettes.

Shortly thereafter, KING re-entered the gas station and jumped through the cashier window. KING subsequently gathered cigarette boxes from the office and carried the boxes into the cashier booth.

At approximately 12:56:59 am, MARTINEZ entered the gas station. MARTINEZ jumped onto the counter and entered the cashier booth. After he jumped into the cashier booth, MARTINEZ assisted in collecting cigarettes.

The Citgo gas station surveillance system also captured images of EUBANKS collecting items, including cigarettes and lottery tickets, and removing those items from the store.

### *Facebook Evidence*

Law enforcement was eventually able to obtain records related to Facebook accounts maintained by EUBANKS, CLAY, KING, GARNER and MARTINEZ. In one Facebook post, created on the date of the suspected arson, KING indicated that he, GARNER and MARTINEZ were on a "money mission." In a "comment" appended to that same posting, KING "tagged" MARTINEZ and wrote: "twin we woke up on mission." MARTINEZ responded: "Factz."

Then, a few minutes later, KING posted a link to a news article related to the officer involved shooting in Kenosha, WI:

KING's next Facebook post was a video on his timeline at approximately 9:52 pm on August 24, 2020, in which he announced that he and his group were in Kenosha, Wisconsin. Later in the video, KING is heard encouraging someone to open a building and start it on fire. Further along in the video, KING is seen walking next MARTINEZ. Near the end of the video, KING is seen walking back towards a black SUV when he is heard repeating an unknown third party's admonition that, "We need to steal so we can start crashing through shit."

14

During the early morning hours of August 25, 2020, KING shared a video on Facebook depicting a bottle of prescription liquid medicine. Around that same time, KING sent another video to another Facebook user, which depicted several boxes of cigarettes, cigars, lottery tickets, and other items. In the video, an unknown male states, "We did that." The recipient of the video asked where KING was located, and KING replied: "Leaving the riot in Wisconsin".

KING sent the same video depicting various consumer items to yet another Facebook user, writing, "Just left Wisconsin riot going back later". Later that same day, KING sent a photo, with listed prices for items believed to be stolen from Kenosha.

In the early morning hours of August 25, 2020, MARTINEZ sent a similar Facebook message to another user: "Pops I got you On my way! Back from Wisconsin I got a lot of shit I happy Fuccin Cday pops".

On August 25, 2020, GARNER sent similar Facebook messages reading "Omw back to Minneapolis from Wisconsin" and "We just got back from Wisconsin".

That same day, GARNER also sent a Facebook message depicting a prescription pill bottle for Hydrocodone-Acetamin. The name on the bottle was "JXXXX BXXXXXX" with a Kenosha, Wisconsin address. After sending the photo of this prescription pill bottle, GARNER sent an additional message: "Do u know anyone who wants viks". The Kenosha Police Department confirmed the prescription pill bottle depicted in the previously mentioned image was reported stolen from the CVS pharmacy located at 3726 22nd Avenue on August 24, 2020.

Later that day, GARNER sent additional messages concerning the sale of "some viks" and "red drank" in his possession.

On August 31, 2020, GARNER wrote the following message to another Facebook user: "Bro I'ma slide to get my gun just tuck it don't ride wit it".

On September 11, 2020, GARNER wrote the following message to another Facebook user: "My bad waiting for my cuzzo n I'll still come thru what y'all on I got more liq n weed n pills".

On August 24, 2020, at 11:57am, CLAY sent the following message to GARNER, "Finna be On my way! Getting oil changed".

On August 24, 2020, at 1:17pm, CLAY sent the following message to Facebook username "Deon Nolove Sanstad": "Let's go puss". Sanstad replied, "where we going", and CLAY wrote, "Wisconsin".

Also on August 24, 2020, at 1:46pm, GARNER received the following message from CLAY: "Here". GARNER and CLAY then had a Facebook video chat at 1:49pm.

On August 24, 2020, at 7:33pm, Facebook username "Davion Williams" sent CLAY the following message: "what city yall in", to which CLAY replied, "Almost to Milwaukee". At 7:36pm, Williams wrote to CLAY, "stop at the next gas station" "we need to grab gas".

15

On August 25, 2020, at 12:28am, CLAY posted a video to Facebook from inside a vehicle that showed crowds of people outside the vehicle. The video included a printed statement "Wisconsin going crazy."

On August 25, 2020, at 12:53am, CLAY posted a video to Facebook from inside a vehicle that was traveling northbound on I94 as the vehicle approached the Marquette interchange in Milwaukee, Wisconsin.

On August 27, 2020, at 2:28pm, CLAY posted a video to Facebook that included images of pills along with the message "run up."

On September 3, 2020, at 2:58pm, CLAY posted a video to Facebook that included images of pills inside a clear plastic bag, along with the message "run up."

On August 24, 2020, at 3:14pm, EUBANKS posted a video to Facebook that showed himself riding in the front seat of a traveling vehicle. The same video depicted KING riding in the backseat and MARTINEZ in the driver's seat.

On August 24, 2020, at 8:24pm, EUBANKS posted another video to Facebook. EUBANKS showed images out the front windshield of a traveling vehicle as it traveled eastbound on I894 and approached the Mitchell interchange in Milwaukee. The video showed the vehicle take the exit southbound on I43 / I94 toward Chicago. The vehicle that EUBANKS was traveling in was following a Dodge car.

On August 25, 2020, at 7:15am, EUBANKS posted a video to Facebook. In this video, EUBANKS encouraged people to "come shop" and showed multiple boxes of product that included cigars and cigarettes stolen from Kenosha.

On August 26, 2020, at 11:57am, EUBANKS posted a video on Facebook. In this video, EUBANKS offered for sale other items stolen from Kenosha.

On July 16, 2021, at 6:09pm, KING posted a video to Facebook, wherein KING says he is upset that people are saying he "told on" GARNER and MARTINEZ. KING opined that if he was cooperating, he would be in jail himself because he is "the ringleader." After approximately 13 minutes into the video, KING says others "might see some" and points an apparent pistol at the camera.

### *Statement of David GARNER*

On August 23, 2021, ATF Special Agents and local officers arrested GARNER. After waiving his *Miranda* rights, GARNER described how: he had traveled to Kenosha with, among others, CLAY, EUBANKS (who he knew as "Poloc"), MARTINEZ, and KING (who he often referred to as "Bubba").

GARNER stated the looting and fires started at a car dealership near downtown that had antique cars and a 2021 Corvette. GARNER offered that KING started breaking stuff at the car dealership and helped start a fire at the dealership. GARNER said KING joined unknown black males who had already started a fire inside the dealership. GARNER stated that KING used a

16

liquid inside a bottle to spray on the fire inside the dealership and the flames began to spread. When asked to further describe the dealership, GARNER said there were two car dealerships on the same street by the same name and the one KING helped start on fire was located nearest to the city hall.

When asked if KING or others started any other fires aside from the car dealership, GARNER replied, "The bar."

GARNER initially stated that KING shot a handgun back at the passing vehicle, but GARNER later said it was either KING or MARTINEZ. GARNER explained he saw both KING and MARTINEZ possess the same handgun in Kenosha – they passed it back and forth.

When asked about the CVS pharmacy, GARNER admitted to stealing bottles of Hennessy. GARNER said he was loading the bottles of Hennessy in a car when the police arrived at the CVS. When asked who took the drugs from the pharmacy, GARNER said it was CLAY.